

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-17-00229-CV

———————————————————

CLC ROOFING, INC., Appellant/Cross-Appellee

V.

E.G. HELZER, Appellee/Cross-Appellant & MARK THOMPSON, Appellee

———

On Appeal from the 342nd District Court
Tarrant County, Texas
Trial Court No. 342-268794-13

———

Before Sudderth, C.J.; Gabriel and Pittman, JJ.
Opinion by Justice Pittman

## OPINION

The jury found that Appellee Mark Thompson and Appellee and Cross-Appellant E.G. Helzer (E.G.) committed fraud against Appellant CLC Roofing, Inc. (CLC). The trial court granted Thompson's motion for judgment notwithstanding the verdict (JNOV) and granted E.G.'s motion in part, reducing the jury's award on the claims against him. In its appeal, CLC complains of both the JNOV for Thompson and the reduction in damages in the final judgment. In his appeal, E.G. challenges the evidence supporting the jury's fraud findings against him. Because we hold that the evidence does not support a fraud finding against either Thompson or E.G., we affirm the trial court's JNOV for Thompson and reverse the trial court's final judgment against E.G.

## BACKGROUND

### I. CLC has a Business Relationship with JEH Company to Purchase Roofing Shingles.

This dispute arose from CLC's business relationship with JEH Company (JEH), which sold roofing and building supplies. JEH was owned by E.G.'s brother Jim Helzer. E.G. was JEH's chief operating officer, and Thompson was a JEH salesperson.

Chad Cross, CLC's owner, had a business and occasionally social relationship with Thompson that predated Cross's founding of CLC. In late 2011, Cross and Thompson discussed CLC starting a bulk buy program with JEH. Cross ultimately

2

negotiated an oral bulk buy agreement with JEH through E.G. Under the program, CLC used a line of credit to buy bulk quantities of roofing shingles from JEH. JEH agreed to hold the purchased shingles until needed by CLC. The parties never reduced their agreement to writing.

CLC's lender required JEH to sign a "Landlord's Release" (the Release) under which JEH acknowledged the lender's security interest in the roofing shingles CLC bought from JEH. It agreed to hold the lender's collateral—specific invoiced, receipted shingles—"with reasonable care for separation and security" in the yard at JEH's Mansfield location. E.G. signed the Release for JEH. Thompson was aware of the Release but was not a party to it and did not sign it.

CLC made multiple bulk buys with JEH. In its last and largest bulk buy, made on June 28, 2012 (the June 2012 bulk buy), CLC ordered 12,000 shingle bundles for $339,428.70.

JEH periodically provided CLC with inventory reports showing how many shingles remained from the bulk buys. These reports were put together by JEH employee Michelle Collins. When CLC wanted an update, Thompson forwarded the request to Collins, who then sent an inventory report to CLC. Collins added shingles to the inventory report when E.G. gave her the details of another CLC bulk buy and subtracted from it when CLC ordered shingles from its bulk buy supply. She did not independently verify that the number of shingles the report showed as remaining from CLC's bulk buys were physically present at JEH's Mansfield location. Cross

3

relied on the inventory reports to decide how many jobs he could or needed to sell and how to price them.

JEH did not fill the bulk buys by taking CLC's money and using it to order shingles from its vendors. Instead, it filled the bulk buys with shingles it already had in its inventory, including shingles for which it had not yet paid its vendors.

In December 2012, in order to pay down debt, JEH returned over $700,000 worth of shingles to one of its vendors, including some shingles that JEH had allocated for CLC's bulk buy and for which CLC had paid JEH. JEH did not replenish the inventory it was supposed to have set aside for CLC to ensure it had shingles segregated to fill CLC's June 2012 bulk buy. Instead, as CLC ordered shingles from what Cross believed was CLC's stored bulk buy shingles, JEH would fill the orders by pulling inventory from its Mansfield location and its other locations. The inventory report provided to CLC in January 2013 did not reflect that JEH had returned some of CLC's shingles or that JEH did not have the remainder of the June 2012 bulk buy shingles set aside for CLC. At some point, Thompson learned about the return to JEH's vendor and that it included some of CLC's shingles, but he did not tell Cross. Despite meeting with Cross in March 2013, E.G. did not tell Cross about the shingles.

## II.  JEH and Jim Helzer File for Bankruptcy and CLC Sues E.G. and Thompson.

In May 2013, JEH and Jim Helzer filed for bankruptcy.  In July 2013, CLC learned that some of its shingles had been returned to JEH's vendor.  Out of the 12,000 bundles CLC paid for in the June 2012 bulk buy, there were 8,468 bundles CLC never received, with a value of $239,535.52.  However, CLC received a payment of $51,321.40 from JEH's bankruptcy case.

CLC sued E.G. and Thompson for fraud, fraud by nondisclosure, and breach of fiduciary duty.[1]  The case was tried to a jury.  At the close of evidence, the trial court granted a directed verdict for Thompson and E.G. on the breach of fiduciary duty claims.

The jury found that E.G. committed fraud by material misrepresentation with respect to the June 2012 bulk buy and that Thompson did not.  It further found that both Thompson and E.G. committed fraud by material omission with respect to the June 2012 bulk buy.  The jury awarded CLC $362,857.87 in actual damages; exemplary damages of $725,715.74 against E.G.; and exemplary damages of $362,857.87 against Thompson.

Thompson and E.G. both filed motions for judgment notwithstanding the verdict.  Both asserted that no evidence supported a fraud finding.  E.G. also argued

---

[1]CLC also sued Williams and JEH's CFO Randy Rabeck.  The jury found that Williams did not commit fraud and that Rabeck committed fraud by material omission.  The trial court granted Rabeck's motion for JNOV.

5

that the evidence only supported a finding of $239,523.52 in actual damages, the value of the shingles CLC did not receive. He further asserted that the parties had stipulated that E.G. was entitled to a $51,321.40 credit for the amount CLC received in the bankruptcy. And, he contended that because actual damages must be reduced, the exemplary damages award also had to be reduced.

The trial court granted Thompson's motion and granted E.G.'s motion in part, sustaining the fraud findings against E.G. but reducing the jury's award. Because the trial court reduced the actual damages award, it also reduced the exemplary damages award. In its final judgment, the trial court awarded CLC $188,202.12 in actual damages and $376,404.24 in punitive damages, plus prejudgment interest and costs.

## CLC'S APPEAL

In its first issue, CLC argues that the trial court erred in granting Thompson's JNOV motion and setting aside the jury's finding that Thompson committed fraud by omission. Thompson counters that the law does not support the duty to disclose relied on by CLC and that there was no evidence that he engaged in any actionable nondisclosure. We agree.

## I. We Review the Trial Court's JNOV Under a Legal Sufficiency Standard.

Upon a party's motion and reasonable notice, a trial court may disregard a jury verdict and render a JNOV if no evidence supports the jury findings on an issue necessary to liability or if a directed verdict would have been proper. *See* Tex. R. Civ.

6

P. 301; *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003); *Fort Bend Cty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 394 (Tex. 1991).

To determine whether the trial court erred by rendering a JNOV, we test legal sufficiency by viewing the evidence in the light most favorable to the verdict. *See Ingram v. Deere*, 288 S.W.3d 886, 893 (Tex. 2009); *Wal-Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709 (Tex. 2003). This means we must credit evidence favoring the jury verdict if reasonable jurors could and must disregard contrary evidence unless reasonable jurors could not. *See Tanner v. Nationwide Mut. Fire Ins.*, 289 S.W.3d 828, 830 (Tex. 2009); *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007). We will uphold the trial court's JNOV if no evidence supports the jury's finding on a vital fact or if the evidence conclusively establishes the opposite of a vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005).

## II. The Trial Court Did Not Err in Granting Thompson's JNOV Motion.

CLC argues that the evidence established that Thompson made representations he later learned were false or misleading but did not disclose what he had learned and that Thompson voluntarily disclosed information without disclosing the whole truth. CLC primarily complains of Thompson's failure to disclose the following information:

> (1) To fill the June 2012 bulk buy, JEH used shingles it already had in its inventory rather than ordering the shingles for the bulk buy from its vendors;

7

(2) JEH failed to keep CLC's bulk buy shingles segregated and on hold for CLC, which CLC alleges Thompson knew before the June 2012 bulk buy occurred; and

(3) In December 2012, JEH returned to its vendor shingles that it had allocated to fill CLC's June 2012 bulk buy and for which CLC had already paid JEH.

However, as we discuss herein, Thompson had no duty to disclose this information.

## A. The Duty to Disclose Information in a Commercial Setting Is Derived from the Restatement of Torts.

Fraud by nondisclosure occurs when a party has a duty to disclose certain matters but does not. *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 219 (Tex. 2019). Thus, to establish fraud by nondisclosure, the plaintiff must show not only that the defendant deliberately failed to disclose material facts but that the defendant had a **duty** to do so. *Id.* at 219–20; *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001). In general, there is **no duty** to disclose without evidence of a fiduciary or confidential (also referred to as "informal") relationship. *Bombardier Aerospace*, 572 S.W.3d at 220.

Section 551 of the Restatement (Second) of Torts—which the Supreme Court of Texas has neither expressly adopted nor rejected—recognizes a general duty of a party to a business transaction to disclose certain information in specific circumstances. Restatement (Second) of Torts § 551; *see Bradford*, 48 S.W.3d at 756 (noting that court never adopted Section 551 of the Restatement); *see also Mercedes-Benz USA, LLC v. Carduco, Inc.*, No. 16-0644, 2019 WL 847845, at *8 (Tex. Feb. 22,

8

2019) (recognizing court had not adopted Section 551 and holding that even were the court to adopt the Restatement's view, there was no evidence to support its application in that case). Under Section 551, **if** a party to a business transaction has a duty to another party to disclose information, then the failure to disclose the information may be actionable for fraud to the same extent that an affirmative misrepresentation could be. *See* Restatement (Second) of Torts § 551(1).

Whether a party has a duty to disclose despite the absence of a confidential relationship is addressed in subsection (2) of Section 551. The duties it sets out all apply **before** the transaction is consummated. For example, if a party has "subsequently acquired information that [the party] knows will make untrue or misleading a previous representation that when made was true or believed to be so," the party must disclose this new information if acquired before the transaction is consummated. *See id.* § 551(2)(c); *see also Susanoil, Inc. v. Cont'l Oil Co.*, 519 S.W.2d 230, 236 n.6 (Tex. App.—San Antonio 1975, writ ref'd n.r.e.) (citing Restatement § 551(2) and noting that it sets out a duty to disclose new information before the transaction is consummated). A party to a business transaction additionally has a duty before the transaction is consummated to disclose matters known to the party that he or she knows to be necessary to prevent his or her partial or ambiguous statement from being misleading, either because the statement purports to tell the whole truth and does not or because it has two possible interpretations, one of which is false. Restatement (Second) of Torts § 551(2)(b) & cmt. g.

9

**B.** **Thompson Did Not Fraudulently Fail to Disclose JEH's Method of Providing Shingles for the June 2012 Bulk Buy.**

CLC argues that the evidence showed that Thompson knew that JEH was filling CLC's bulk buys, including the June 2012 bulk buy, with its existing inventory rather than ordering the shingles from its vendors. It contends that "[t]his is some evidence from which the jury could conclude that Thompson knew the bulk buy program was not being handled as represented under the [Release] and that he knew this at the time CLC made its final, June 2012 bulk buy purchase"—that is, that Thompson had information he should have disclosed before CLC made the June 2012 bulk buy.

We reject CLC's argument for two reasons. *First*, no evidence showed that Thompson was aware of the Release provision that CLC relies on. In fact, he did not sign the Release, and the only evidence about his knowledge of the Release's terms was his testimony that he was aware CLC's shingles needed to be segregated at the Mansfield location. *Second*, even if evidence had shown his awareness of all of the Release's terms, the Release did not require JEH to purchase the shingles for the bulk buys from its vendors rather than pull them from its inventory.

Specifically, the Release contains the following provision on which CLC relies:

> Borrower's personal property stored on Landlord premises is limited to **certain and specific asphalt shingles (determinable by specific invoice and payment receipts) purchased for good funds but held at JEH Company**, (the Landlord) while waiting specific delivery dates, locations, and/or quantities and/or while holding Borrower's property making it available for specific job pick-up during

10

regular business hours. The specifically described (Invoiced/receipted) Borrower's property will be held by the Landlord with reasonable care for separation and security within the existing confines of the Landlord's fenced, gated, and [i]nsured premises (yard). [Emphasis added.]

Assuming that the representations JEH made by signing the Release were representations made not only to CLC's lender but also to CLC on which CLC reasonably relied and that Thompson represented that JEH would abide by its terms, it is not evidence of a misrepresentation by Thompson. The language relied on by CLC—"certain and specific asphalt shingles (determinable by specific invoice and payment receipts) purchased for good funds"—does not prohibit JEH from selling CLC shingles from its own inventory to fill the bulk buys. Absolutely nothing in the Release indicates that the phrase "specific invoice and payment receipts" means "invoices from JEH's vendors and payment receipts showing payments by JEH to its vendors." Instead, the most natural reading of the language is that it refers to shingles purchased by CLC "for good funds" from JEH, held by JEH, and determinable by the invoices generated by JEH for the shingles CLC ordered and by the receipts JEH issued to CLC after receiving CLC's payment. *See Compass Bank v. Calleja-Ahedo*, 569 S.W.3d 104, 114 (Tex. 2018) ("Contracts . . . should be construed based on their plain language."); *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996) ("We give terms their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used them in a technical or different sense."); *accord Ogden v. Saunders*, 25 U.S. (12 Wheat) 213, 332 (1827) (Marshall, C.J. dissenting) ("To

11

say that the intention of the instrument must prevail; that this intention must be collected from its words; that its words are to be understood in that sense in which they are generally used by those for whom the instrument was intended; that its provisions are neither to be restricted into insignificance, nor extended to objects not comprehended in them, nor contemplated by its framers;—is to repeat what has been already said more at large, and is all that can be necessary."). Thus, JEH's practice of filling the bulk buy orders with shingles it already had in its inventory simply does not support a claim that the Release provision was a misrepresentation.

To the extent that CLC complains of Thompson's failure to disclose that some of the shingles JEH used to fill the June 2012 bulk buy had not yet been paid for by JEH, there was no evidence that Thompson was aware of this practice. CLC points out that Thompson knew that JEH was having financial trouble—a forensic accountant testified for CLC that JEH was in debt in 2012 and that "[t]here was some deposition testimony provided that they—that E.G. and Mr. Thompson were aware and had a plan, had budgets that they presented to the owner that . . . if they had met certain sales targets, that they would be able to break even at least." But Thompson testified that as a salesperson he had no access to the financial dealings of JEH and did not know who they owed money to. No evidence contradicted this testimony. Even if Thompson knew the company was generally having financial difficulties in 2012, CLC points to no evidence that Thompson knew JEH had not paid for the shingles it had allocated to CLC for the June 2012 bulk buy, and, after an exhaustive

search, we have found none in the record. Accordingly, Thompson cannot be liable in fraud for failure to disclose that JEH had not paid for all the shingles it used to fill the June 2012 bulk buy. *See PlainsCapital Bank v. Reaves*, No. 05-17-01184-CV, 2018 WL 6599020, at *5 (Tex. App.—Dallas Dec. 17, 2018, pet. denied) (mem. op.) ("[A] party cannot be guilty of fraudulently or intentionally concealing facts of which he is not aware.").

We overrule this part of CLC's first issue.

### C. Thompson Had No Duty to Disclose That JEH Stopped Segregating CLC Shingles or Returned Some to Its Vendor.

CLC contends that Thompson had a duty to disclose JEH's December 2012 return and its failure to segregate the June 2012 bulk buy shingles. The contention is misguided.

#### 1. Thompson Had No Duty to Disclose JEH's Failure to Segregate CLC Bulk Buy Shingles.

CLC argues that Thompson made representations that the materials CLC purchased would be stored and segregated at JEH's Mansfield facility and that Thompson knew before the June 2012 bulk buy that JEH was not complying with this representation. But the evidence does not support a claim for failure to disclose based on any representation about segregation.

Assuming that Thompson can be liable for representations made in forming an agreement to which he was not a party and to which he had no authority to bind JEH, there is no evidence that Thompson had any reason to believe that JEH would not

13

segregate CLC's shingles and store them at the Mansfield location. Nor is there evidence that he learned—either before June 28, 2012, when CLC made its last bulk buy or from that date until the date on which he learned of JEH's December 2012 return—that JEH was not doing so. In fact, the evidence supports an opposite finding. Thompson testified that he assumed it was being done, that he never went to the Mansfield facility to check that JEH was doing so, and that he did not keep track of inventory for JEH or participate in a company inventory during that time period. Even if JEH had failed to segregate CLC's shingles before the June 2012 bulk buy (a claim we address below with E.G.'s issues), Thompson had no duty to—and he certainly could not fraudulently fail to—provide information he did not possess. *See PlainsCapital Bank*, 2018 WL 6599020 at *5; *see also* Restatement (Second) of Torts § 551 (imposing duties to disclose matters known to a party to a transaction).

CLC points out that Thompson testified that when Cross requested materials for jobs from its bulk buy supply, Thompson would check JEH's inventory to make sure the materials were in stock. Specifically, Thompson testified that when Cross asked for material, he (Thompson) would call JEH to check if "there was enough material to satisfy that specific order." CLC contends that if its materials had been purchased and stored as represented, there would be no need to check JEH's inventory, and therefore this testimony shows that Thompson knew JEH was not complying with its representations. We disagree.

14

In context of all the evidence, this testimony is simply not the evidence CLC hopes it to be. Thompson testified that when CLC placed a bulk buy order, he "made the assumption that [the material] was either on hand or would be ordered." He further testified that when Cross would ask about the status of their bulk buy purchases, he turned that request over to Michelle Collins for her to generate a report for CLC. In other words, he did not keep track of how much material CLC had left from its bulk buys at any given time. Rather, he had to check with someone at JEH to see if CLC still had material left from its last bulk buy or if CLC had depleted its supply. There was no evidence that Thompson kept track of how many shingles CLC used from its bulk buys and thus no evidence that he would already know, without checking with someone at JEH, whether CLC still had shingles remaining from its last bulk buy. Indeed, the evidence showed that even Cross did not track CLC's usage himself; hence the reason why he periodically asked JEH to provide him with the inventory reports he consulted before accepting jobs. We cannot agree that Thompson's need to check on the same information that Cross did indicates that Thompson knew JEH was not complying with its agreement to segregate CLC's shingles.

We overrule this part of CLC's first issue.

15

### 2. Thompson Had No Duty to Disclose the December 2012 Shingles Return.

CLC argues that Thompson and Cross had a confidential relationship and therefore Thompson had a duty to disclose the December 2012 shingles return. However, the trial court granted a directed verdict on CLC's breach of fiduciary duty claim against Thompson on the ground that the evidence did not support a finding of an informal fiduciary relationship, and CLC does not appeal from the directed verdict. Thus, the jury's verdict cannot be upheld on the basis that Thompson had a duty to disclose information because of a confidential relationship. *See* Tex. R. Civ. P. 279; *Shin-Con Dev. Corp. v. I.P. Invs., Ltd.*, 270 S.W.3d 759, 768 (Tex. App.—Dallas 2008, pet. denied) ("Unless a theory of recovery is established as a matter of law, a judgment cannot be rendered on a ground that was not submitted to the jury.").

CLC further argues that even without a confidential relationship, Thompson had a duty to disclose the December 2012 shingles return to Cross. This contention is without merit; Section 551 of the Restatement does not confer on parties to a transaction a duty to disclose information learned **after** the transaction is consummated. *See* Restatement (Second) of Torts § 551(2). Thompson could not have learned of the return before CLC made the June 2012 bulk buy because it did not occur until six months **after** the bulk buy.

CLC acknowledges that the Supreme Court of Texas has expressly pointed out that it has never adopted Section 551. *See Bradford*, 48 S.W.3d at 756. But CLC argues

16

that aside from the Restatement, numerous courts of appeals, including this court, have concluded that a duty to disclose may arise in the following circumstances: (1) when one voluntarily discloses information, the whole truth must be disclosed; (2) when one makes a representation, new information must be disclosed when that new information makes the earlier representation misleading or untrue; and (3) when one makes a partial disclosure and conveys a false impression. However, it is worth noting that the application of these duties to a business transaction in the absence of a confidential or fiduciary relationship traces back to Restatement Section 551.[2] *See Mercedes-Benz USA*, 2019 WL 847845, at *7.

---

[2]Technically, Texas courts had applied a duty to tell the whole truth in a business transaction before publication of the Restatement (Second) of Torts. However, its application had generally been in situations involving confidential or fiduciary relationships—i.e., in cases where a party already had a duty of disclosure. *See Wilson v. Jones*, 45 S.W.2d 572, 574 (Tex. Comm'n App. 1932, holding approved); *State Nat. Bank of El Paso v. Farah Mfg. Co., Inc.*, 678 S.W.2d 661, 681 (Tex. App.—El Paso 1984, writ dism'd by agr.) (citing *Wilson* and Restatement (Second) of Torts §§ 529, 551). In 1995, the Corpus Christi Court of Appeals set out the obligation to tell "the whole truth" in a business transaction as a duty that arises regardless of whether a confidential or fiduciary duty exists. *See, e.g.*, *Formosa Plastics Corp., USA v. Presidio Eng'rs & Contractors, Inc.*, 941 S.W.2d 138, 146–47 (Tex. App.—Corpus Christi 1995) (citing *Farah* for the proposition that voluntarily disclosing information in a commercial setting creates a duty to disclose the whole truth but not noting that *Farah* arose in the context of a confidential relationship and not acknowledging Section 551 as the source of applying the duty to all business transactions), *rev'd on other grounds*, 960 S.W.2d 41 (Tex. 1998); *see also Hoggett v. Brown*, 971 S.W.2d 472, 487 (Tex. App.—Houston [14th Dist.] 1997, pet. denied) (citing *Formosa Plastics*). Courts of appeals since then have followed *Formosa Plastics* and *Hoggett* to hold that there is a duty to disclose the whole truth even in the absence of a confidential or fiduciary relationship, and without always acknowledging the Restatement as the source of that duty. *See Mercedes-Benz USA*, 2019 WL 847845, at *7.

17

As CLC notes, some courts of appeals, including this one, have held that such a duty exists without referencing Restatement Section 551 or noting that the duty derives from that source. *See, e.g.*, *Omni Metals, Inc. v. Poe & Brown of Tex., Inc.*, No. 14-00-01081-CV, 2002 WL 1331720, at *3 (Tex. App.—Houston [14th Dist.] June 13, 2002, pet. denied) (not designated for publication) (treating Section 551 of the Restatement and its own *Hoggett* opinion as separate bases for the duties set out in Section 551 but not noting that *Hoggett* relied on cases from other courts that in turn relied on either Section 551 or on another case that relied on Section 551); *see also Citizens Nat'l Bank v. Allen Rae Invs., Inc.*, 142 S.W.3d 459, 477 (Tex. App.—Fort Worth 2004, no pet.) (citing *Hoggett* and *Ralston Purina Co. v. McKendrick*, 850 S.W.2d 629, 633–36 (Tex. App.—San Antonio 1993, writ denied), which relies on Section 551 for the duty to disclose new information). Thus, the duties set out in Section 551(2) have been generally recognized by a number of courts of appeals. *See Mercedes-Benz USA*, 2019 WL 847845, at *7 (noting that the court of appeals had set out certain situations that give rise to a duty to disclose, including learning new information that makes a previous disclosure misleading, and that while the situations described were similar to those provided in Section 551, "the court of appeals' opinion does not reference that as its source"); *Bradford*, 48 S.W.3d at 755 (citing *Hoggett* and *Ralston Purina* for the proposition that several courts of appeals have held that a duty to disclose information may arise in an arms-length business transaction and noting that Section 551 "also recognizes a general duty to disclose facts in a

18

commercial setting"); *see also Bombardier Aerospace Corp.*, 572 S.W.3d at 220 (stating in dicta, without reference to the Restatement or the court's previous declination to adopt Section 551, that there may be a duty to disclose new information in a business setting and citing cases in support that either rely on Section 551 or cite to other cases that relied on that section).

The opinions that, without citing Section 551, recognize a duty to disclose new information in a business setting do not expressly limit the imposition of the duty only to the time period before a transaction closes. *See, e.g.*, *Citizens Nat'l*, 142 S.W.3d at 477; *Hoggett*, 971 S.W.2d at 487. *Contra Susanoil*, 519 S.W.2d at 236 & n.6 (holding that the defendant had a duty to disclose certain information to the plaintiffs *before* closing the transaction and citing Restatement Section 551).[3] Most importantly though, even were we to hold that in some circumstances, a duty to disclose new information in a commercial setting may extend to after the close of a business transaction, we would not and could not do so in this case. What CLC essentially contends that Thompson failed to disclose after consummation of the June 2012 bulk buy was JEH's breach of the Release or of its oral agreement with CLC. That, without more, is not a valid basis for a fraud by nondisclosure claim. To hold otherwise would compel any person with knowledge of their employer's breach of

---

[3]*Susanoil* is the earliest Texas case we found setting out a duty to disclose in a business setting new information that makes previously disclosed information misleading or untrue.

contract to proactively disclose that breach to the other contracting party or be liable for fraud. *Cf. Oliver v. Rogers*, 976 S.W.2d 792, 803–04 (Tex. App.—Houston [1st Dist.] 1998, pet. denied) (citing *Susanoil*, holding that a party's failure to inform the other party to a contract of the first party's decision not to perform the contract is not actionable as fraud if the decision not to perform was made after the transaction closed, and distinguishing cases where a party induced another into signing a contract with a promise never intended to be kept from cases in which a party intended to perform and then changed his mind and refused, because "otherwise, every breach of contract would involve fraud"). This is not the law in Texas. Accordingly, Thompson's failure to inform CLC of JEH's returning shingles to JEH's vendor cannot support a fraud by omission claim.

We overrule this part of CLC's first issue.

### D. Thompson's Representations About JEH's Buying Back Shingles Do Not Make the JNOV Reversible.

CLC further argues that while Thompson represented that JEH would buy back any materials that CLC could not use, "this proved not the case." Specifically, CLC complains of shingles it ordered in March 2012 for anticipated roofing work in McAllen, Texas that it ultimately decided not to take on. Cross acknowledged at trial that Thompson worked with him to get JEH to take back unused materials and that JEH ultimately accepted their return, but CLC complains that JEH issued it an

account credit for the returned materials rather than giving it a cash refund. The testimony at trial was that JEH's policy was to issue credit for returns.

However, the trial court limited the jury's consideration of fraud to misrepresentations and omissions made in connection with the June 2012 bulk buy, a decision CLC does not challenge on appeal. The McAllen shingles were not part of that purchase.[4] Accordingly, the jury's finding of fraud cannot be upheld based on any representations Thompson made about JEH's buy-back policy and its issuing credit for the returned McAllen shingles.

We overrule the remainder of CLC's first issue.

## III. We Need Not Address CLC's Remaining Issues.

In its second and third issues, CLC complains of the trial court's reduction of the actual damages award and the exemplary damages award, respectively. We do not address these two issues because we sustain below the first two issues in E.G.'s appeal. *See* Tex. R. App. P. 47.1.

### E.G.'S APPEAL

In his first issue, E.G. argues that there was legally and factually insufficient evidence to support the jury's finding of fraudulent misrepresentation. In his second

---

[4]However, the trial court instructed the parties that CLC could use evidence regarding "the McAllen stuff" on the exemplary damages issue to argue a culpable state of mind.

issue, E.G. argues that the evidence was legally and factually insufficient to support the jury's finding of fraud by omission. We agree.

## I. We Must Reverse Only if No Evidence Supports the Verdict or the Verdict is Contrary to the Overwhelming Weight of All the Evidence.

We may sustain a legal-sufficiency challenge—that is, a no-evidence challenge—only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014) (op. on reh'g); *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998) (op. on reh'g). In determining whether legally sufficient evidence supports the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and must disregard contrary evidence unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co.*, 228 S.W.3d at 651; *City of Keller*, 168 S.W.3d at 807, 827.

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all the pertinent record evidence, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*,

22

715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). If reversing for factual insufficiency, we must detail the evidence relevant to the issue or point in consideration and clearly state why the finding is factually insufficient—that is, why the evidence supporting the finding is so weak or is so against the great weight and preponderance of the evidence that the finding is manifestly unjust, shocks the conscience, or clearly demonstrates bias. *Pool*, 715 S.W.2d at 635.

## II. The Evidence is Legally Insufficient to Support the Jury's Finding of Fraudulent Misrepresentation.

On the fraud by material misrepresentation claim, the charge instructed the jury that

Fraud by material misrepresentation occurs when—

a. a party makes a material misrepresentation, and

b. the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion, and

c. the misrepresentation is made with the intention that it should be acted on by the other party, and

d. the other party relies on the misrepresentation and thereby suffers injury.

*See Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018) (setting out the elements of fraud).

23

As it had against Thompson, CLC alleged that by signing the Release, E.G. misrepresented to CLC that it would use the money CLC paid in the bulk buy transactions to purchase shingles directly from JEH's vendors, rather than satisfy the bulk buy by filling the order with shingles JEH already had in its inventory. However, as we discussed above, the Release did not prohibit JEH from filling the bulk buys with shingles it already had in its own inventory.

CLC also argued that the Release required JEH to segregate the bulk buy shingles CLC purchased and that E.G.'s signing the Release constituted fraud because JEH did not segregate the shingles. We agree that by E.G.'s signing the Release, JEH agreed to segregate CLC's bulk buy shingles. But we strongly disagree that the evidence supports a fraud finding based on this representation.

"While breach of the contract alone is not evidence that a party did not intend to perform, breach combined with slight circumstantial evidence of fraud is some evidence of fraudulent intent." *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 775 (Tex. 2009) (citation and internal quotation marks omitted). Thus, JEH's failure to segregate CLC's bulk buy shingles from JEH's other inventory could support a fraud claim only if there was other circumstantial evidence of fraud. However, there is no evidence that JEH failed to segregate the shingles for bulk buys prior to the June 2012 bulk buy, and the only (albeit limited) evidence on this question is that until at least several months after the June 2012 bulk buy, JEH did segregate CLC's shingles.

24

E.G. testified that when a bulk buy order was placed by a company, they only entered the order in their computer system if they had enough of the product in stock to fill the order, and after the order was entered, the product was removed from the system and "set aside" to ensure the shingles were not sold to anyone else. He further testified that "[t]he product was stored in CLC's things." Thompson testified that while he did not specifically check to see if CLC's bulk buy orders were segregated on the Mansfield lot, when he went to the Mansfield location, he would see various bulk buy orders set aside on the lot with the customer's name spray painted on them. The forensic accountant testifying for CLC testified that JEH did not segregate the bulk buy shingles in its *accounting* system, but he provided no evidence about whether the CLC bulk buy shingles were physically pulled from JEH's inventory and set aside for exclusive use by CLC. The forensic accountant further testified that in September 2012, JEH's Mansfield inventory fell below what was needed to complete the June 2012 bulk buy. But assuming that JEH's accounting system accurately reflected how many shingles were physically present at the Mansfield location, including shingles physically set aside for JEH's customers and any shingles that may have been brought over from other locations to fill customer orders, this shows only that JEH was no longer complying with the Release and its agreement with CLC several months after CLC placed the June 2012 bulk buy.

While this testimony is not overwhelming evidence that JEH segregated CLC's bulk buy shingles, it is the only relevant evidence related to JEH's practice of

segregation, and it does not establish that JEH failed to segregate the shingles before the June 2012 bulk buy. Moreover, it does not show that E.G. represented JEH would segregate the shingles while never intending to do so. Because no evidence supports the jury's finding, we sustain E.G.'s first issue.

## III. Insufficient Evidence Supports the Jury's Finding of Fraud by Omission.

In his second issue, E.G. argues that the trial court erred by denying his motion for JNOV on the fraud by omission claim because the evidence was legally and factually insufficient to support the jury's finding on that claim. We agree.

CLC contends that E.G. should have disclosed that (1) JEH took shingles that had been allocated for CLC's bulk order and for which CLC had paid JEH and returned them to JEH's vendor; (2) JEH did not segregate materials for CLC's bulk buy orders; and (3) JEH pulled the shingles for the June 2012 bulk buy from JEH's existing stock rather than taking CLC's bulk buy payment and using it to buy shingles specifically for CLC.

No evidence established E.G.'s liability under the grounds asserted by CLC. As we discussed above, there is no evidence that E.G. failed to disclose JEH's noncompliance with the Release because there is no evidence that JEH was prohibited from pulling the bulk buy shingles from its own inventory, and there is no evidence that prior to the June 2012 bulk buy, JEH failed to segregate the bulk buy shingles. Thus, at the time E.G. signed the Release, JEH's promise to segregate the shingles was not a partial disclosure that conveyed a false impression or failed to

disclose the whole truth. And when JEH made the December 2012 shingles return and stopped segregating CLC's bulk buy shingles, the bulk buy transaction had already been consummated. *See* Restatement (Second) of Torts § 551(2) (providing that "[o]ne party to a business transaction is under a duty to exercise reasonable care to disclose [certain information] to the other **before** the transaction is consummated" (emphasis added)). Any disclosure after that time would have required E.G. to disclose JEH's breach of its agreements, which he had no duty to do. *See Oliver*, 976 S.W.2d at 804. Thus, E.G.'s failure to disclose the return cannot support a fraud by omission claim. *See id.*; Restatement (Second) of Torts § 551(2); *see also Mercedes-Benz USA*, 2019 WL 847845, at *8 ("[E]ven were we to adopt the Restatement's view, there would be no evidence to support its application here"). And the record is devoid of any evidence establishing the existence of a confidential relationship between CLC and E.G. that would otherwise give E.G. a duty to disclose the information.

We sustain E.G.'s second issue. Because these two issues are dispositive, we do not address E.G.'s remaining issues. *See* Tex. R. App. P. 47.1.

## CONCLUSION

Having sustained E.G.'s first two issues, we reverse the trial court's final judgment and render judgment that CLC take nothing on its claims against E.G. Having overruled CLC's first issue, we affirm the trial court's judgment notwithstanding the verdict as to Thompson.

27

                                        /s/ Mark T. Pittman
                                        Mark T. Pittman
                                        Justice

Delivered:  July 11, 2019